**UNITED STATES of America**

v.

**Florence Abieyuwa
OBAYAGBONA, Defendant.**

No. 85–CR–456.

United States District Court,
E.D. New York.

Dec. 27, 1985.

Raymond J. Dearie, U.S. Atty., E.D. of N.Y., Brooklyn, N.Y. by John Gleeson, Diane F. Giacalone, for U.S.

Julius M. Wasserstein, New York City, for defendant.

WEINSTEIN, Chief Judge:

Defendant Florence Abieyuwa Obayagbona was found guilty by a jury of conspiracy to distribute heroin. Relying on evidentiary errors she seeks a new trial. For the reasons indicated below her motion is denied.

I. *Facts and Trial*

The defendant is a 27-year-old citizen of Nigeria. She entered the United States on the morning of July 6, 1985, with another Nigerian woman, Ehimwema (Clara) Onaiwu, who admitted her guilt of various drug charges. Testifying at her own trial, defendant asserted that she came to the United States solely to buy cosmetics for her store in Benin City, Nigeria.

On July 16, an informant for the Drug Enforcement Administration arranged to meet Onaiwu to introduce her to a prospective purchaser of heroin. The informant picked up Ms. Onaiwu at her hotel when

she was staying with defendant. He escorted the two comely young ladies by taxi to the Promenade, a modest restaurant on Brooklyn Heights convenient to this court and various law enforcement agencies, sometimes used by the government for undercover purchases of narcotics. Defendant wore a striking black-and-white long print dress with a matching petite black purse for the occasion. Onaiwu was more colorfully attired and carried a large red leather shoulder handbag. At the restaurant they were introduced to FBI Special Agent Michael Turner. Equipped with a hidden sound recorder and the pseudonym "Joe," he was prepared to romance the ladies while simulating a desire to purchase substantial quantities of heroin.

Sitting across the table, this attractive foursome flirted while "Joe" and Onaiwu negotiated the terms of a sale of 100 grams of heroin. For the most part defendant remained demurely silent except as she responded by appreciative murmurs to compliments.

The agent asked to receive a small sample of the heroin for testing before completing the transaction. Onaiwu indicated that she needed a few hours to get the drug since it was in the Bronx. The four arranged to meet again at the same restaurant later that afternoon.

During the second meeting they again sat at a small table—the two men side by side facing the two women in an intimate group. Agent Turner suggested to Onaiwu that she go to the ladies' restroom to put the heroin sample in a piece of paper towel.

What happened next was the subject of considerable controversy at the trial. Agent Turner's microphone picked up conversation between him and the informant. Neither woman's voice appears on the tape during those ensuing two-and-a-half minutes. The candid conversation between the two men working undercover about how their trap was closing strongly suggests that no target of an investigation could have been present. At trial Agent Turner testified that Onaiwu and the defendant left the table together after the agent suggested the trip to the ladies' room. The defense vigorously disputed this contention. Following a suggestion from the court that the incriminating conversation would be played unless counsel for the defense stipulated that the defendant had been absent from the table for approximately two-and-one-half minutes, that stipulation was entered into.

According to the testimony of Agent Turner, the two women returned from the ladies' room together. It was, he said, the defendant and not Onaiwu who reached into a small black purse, took out a folded piece of paper towel and handed it to him. Turner testified that he took the paper to the men's room and tested the sample of powder it contained, determining that it was heroin. The agent returned to the table. After some further comments about defendant's pretty eyes by "Joe" and an implication that they would share hotel rooms, the two couples left the restaurant. FBI agents were waiting outside. They placed all four in custody.

Agent Turner, "under arrest" for the sake of the scenario, was handcuffed and thus unable to touch the controls of his tape recorder. While the machine continued to record, his fellow agents asked about the heroin. Turner's words are audible against background noise and commotion: "The girl in the black and white [dress] handed it to me out of her purse. But they both went to the—to the ladies' room at the [same] time." The defendant was, as you will recall, dressed in black and white. There was also some excited boasting about the fact that the ladies had arranged for hotel rooms where they would all remain together after the deal was consummated.

In Onaiwu's large handbag, the FBI agents found extensive documents suggesting that Onaiwu used a variety of aliases in her own "cosmetic business." They also discovered a communication from one "Lizzy," then in federal prison for heroin importation. In the letter the writer assured the recipient of their great mutual loyalty and referred to a "vow," apparently to

support each other and others similarly situated were they apprehended. Onaiwu at trial admitted that the letter had been found in her bag but denied that she was the person to whom it had been addressed.

Immediately following the arrest, the FBI agents tried to find the parcel of heroin that Onaiwu had said she would bring to the meeting. They were constrained because there was no female agent available to search the ladies' persons. The defendants were handcuffed, defendant with her hands behind her back and Onaiwu with her hands in front, and put into a waiting car. The driver of the car testified that the back floor was covered with empty coffee cartons, newspapers and other debris.

A subsequent body search of the two ladies uncovered no heroin. The agents then went back to the car. There they found the parcel of heroin hidden near where Onaiwu had sat. Onaiwu testified at defendant's trial that she had had the heroin in her girdle. Since her hands were relatively free, she had been able to remove the parcel and push it under the litter with her foot. The defendant testified that she had observed Onaiwu remove and conceal the heroin.

Onaiwu and the defendant were indicted for conspiracy to violate the federal narcotics laws, distribution of heroin, and possession of heroin with intent to distribute. Onaiwu pleaded guilty to all three counts and was awaiting sentence at the time of defendant's trial. Defendant was acquitted of the possession and distribution counts and convicted of the conspiracy count.

The critical testimony at trial came from the defendant, Onaiwu, and Agent Turner. The confidential informant who had participated in the restaurant meetings was available as a witness but was called by neither side. On direct examination Agent Turner gave the version of the heroin deal already described. The agent was vigorously cross-examined for the purpose of showing that he was lying or mistaken when he testified that it was the defendant who handed him the sample.

Defendant and Onaiwu gave an account different from the agent's. They said they left the table separately and that the defendant waited outside the ladies' room—which was too small, according to them, to accommodate two persons at once. Onaiwu, they told the jury, asked for the defendant's black purse to borrow her lipstick and, without defendant's observing the action, placed the sample in it and then removed it at the table to give to "Joe."

After the testimony of Onaiwu and the defendant, the government sought on rebuttal to introduce the tape of Agent Turner's statement made contemporaenously with the arrest: "The girl in the black and white handed it to me out of her purse." Over objection, the court allowed the tape to be played. According to a stipulation, "14 minutes and 25 seconds" elapsed between the receipt of the sample by Special Agent Turner and his taped statement. The recording was admitted on the issue of credibility, both of Turner and of the two ladies, as well as evidence-in-chief. The jury was instructed to treat it cautiously:

THE COURT: I will permit it, but I caution the ladies and gentlemen [of the jury], that this is hearsay. The defendant was not present during those remarks and the witness was not then subject to cross examination, with respect to why he made those remarks or anything about them.

Is that clear?

I am letting you hear it nevertheless, for whatever help it may give you *on credibility of this witness or the other witnesses or as evidence of the acts charged*, but I caution you, it's hearsay.

It has to be received and evaluated with great caution.

Is there any other instruction you wish me to give?

MR. WASSERSTEIN [for defendant]: No, your Honor.

(Emphasis added.)

II. *Law*

Since Agent Turner's statement was clearly recorded on tape, both the accuracy

of the record and the fact that he made the statement are unquestioned. Of the four elements of credibility—accuracy of observation, memory, capacity to communicate and sincerity—the only one seriously at issue is sincerity. Did the agent-witness, while he was an extrajudicial declarant speaking into his recorder, tell the truth about what he then remembered his observation to be?

### A. *Admissibility of Agent Turner's Taped Statement*

#### 1. *Credibility Rehabilitation and a Prior Consistent Statement Under Rule 801(d)(1)(B)*

Rule 801(d)(1)(B) of the Federal Rules of Evidence excludes from its definition of hearsay a prior statement by a witness "consistent with his testimony and ... offered to rebut an express or implied charge against him of recent fabrication or improper motive....," provided that the declarant testifies at trial and is available for cross-examination on the statement. The defense argues that it did not charge Agent Turner with a recent fabrication or improper motive and therefore his recorded statement was inadmissible as evidence-in-chief under the hearsay rule.

Before the enactment of the Federal Rules of Evidence, there was lively debate over the admissibility of prior consistent statements. *See* 4 Wigmore, Evidence §§ 1122–1133 (Chadbourn rev. 1972). Note particularly the footnote discussing the reactions of Judges Augustus Hand and Friendly to Judge Cooley's statement in *Stewart v. People*, 23 Mich. 63, 74–76 (1871), that "discretion in receiving [consistent statements for rehabilitation] ought not to be set aside except in a clear case of abuse." *Id.* at § 1126, n. 6. Because he believed that "an improbable or untrustworthy story ... is not made more probable or more trustworthy by any number of repetitions of it," *id.* at § 1124, Wigmore concluded that a prior consistent statement should be admissible only in the most limited circumstances. If Wigmore is right the trier would not be much impressed with

the consistency, but common experience with life and trials tells us that a prior consistent statement of a witness often has considerable probative force on the issue of credibility. The view of the Advisory Committee that drafted the Federal Rules is somewhat ambiguous. In its Notes to Rule 801(d)(1)(B) the Committee noted: "if the opposite party wishes to open the door for its admission in evidence, no sound reason is apparent why [the prior consistent statement] should not be received generally." Notes of Advisory Committee on Proposed Rules, 56 F.R.D. at 296. This laissez-faire attitude is understandable since the jury already has the witness's version from the witness stand and the consistent statement will generally help the trier only in evaluating his or her credibility.

■ How the door was to be opened to prior consistent statements was not stated by the draftsmen. Nevertheless, it is clear from the whole thrust of the Rules that relevancy is to be broadly construed and the trial judge permitted broad discretion to allow in evidence that might assist the trier in determining the probability that material propositions are true. *See* Fed.R. Evid. 102, 401–403, 611. Because determining the credibility of a key witness is crucial to deciding the case, evidence denigrating or supporting credibility should be readily admissible subject to rules of exclusion and such factors as possible confusion of the jury and waste of time by extrinsic proof. *See, e.g.,* Fed.R.Evid. 403, 608.

■ Such free admissibility of prior consistent statements would be on the issue of credibility, not as evidence-in-chief, unless the hearsay rule was satisfied—or, as in the case of Rule 801(d), declared nonoperative. Only if the prior consistent statement overcomes the hearsay barrier would it be admitted as an independent line of proof as well as on credibility of the witness. *See generally* the concurring opinion of Judge Friendly in *United States v. Rubin*, 609 F.2d 51, 66–70 (2d Cir.1979), *aff'd on other grounds*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), pointing out the distinc-

tion between the two purposes for which prior consistent statements may be used and the different grounds for admissibility depending on purpose.

Since the court allowed the taped statement to be used for both purposes evidence-in-chief and credibility, it is necessary to first consider whether it falls within Rule 801(d)(1)(B). Before turning to the interpretation of that rule, to fully appreciate the prior consistent statement problem in the context of this case it is desirable to dwell for a moment more on the credibility/evidence-in-chief distinction.

■ Rule 801(d)(1)(B), as Judge Friendly persuasively argues, was enacted to make admissible as substantive evidence only a narrow category of the much larger group of prior consistent statements admissible for rehabilitation. *See Rubin,* 609 F.2d at 69–70. When the statement is used only for rehabilitation it need not fall within the more rigorous requirements of Rule 801(d)(1)(B). Consistent statements aimed solely at rehabilitation are offered only for the fact of their having been made, not for their truth. Hence they are not hearsay. *See id.* at 69. (We discuss the problem as one of hearsay even though for purely drafting convenience 801(d) defines nonhearsay.) Rule 801(d)(1)(B), to reemphasize the point, does not address the admissibility of prior consistent statements used only in connection with credibility. *Accord, United States v. Check,* 582 F.2d 668, 680–81 (2d Cir.1978).

The Supreme Court recently lent support to the liberal Friendly view of relevance as the test for admissibility of prior consistent statements on credibility. In *United States v. Abel,* —— U.S. ——, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984), the district court had admitted evidence at trial to show that a defense witness and the defendant were members of a secret prison gang sworn to "lie, cheat, steal [and] kill" for mutual protection. The Supreme Court upheld the admission of this evidence. In so doing, it noted that "the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might

bear on the accuracy and truth of a witness' testimony." *Abel,* 105 S.Ct. at 469.

For purposes of assessing credibility, a prior consistent statement made by a witness who is available for cross-examination is as relevant as the *Abel* witness' prior expression of commitment to the secret society. In both situations the danger of prejudice exists. In both situations the issue of credibility is merely influenced, not disposed of, by the admission of the evidence of consistency.

Credibility of a witness is always critical in assessing the probative force of a testimonial line of proof and thus of the probability of the truth of the material proposition. Rule 401, Federal Rules of Evidence. *See, e.g., Abel* at 468–69; *McKinzy v. Wainwright,* 719 F.2d 1525 (11th Cir.); *United States v. Mansaw,* 714 F.2d 785 (8th Cir.), *cert. denied sub nom. Holliman v. United States,* 464 U.S. 964, 104 S.Ct. 403, 78 L.Ed.2d 343 (1983). Questions of credibility are therefore basically governed by Rules 401 to 403 of the Federal Rules of Evidence. Rules 608, 609 and 613 are examples of specific limits on admissibility of credibility evidence. There are no such limits in Rule 801; it does not constrain the use of prior consistent statements limited to rehabilitation of a witness. See Rule 105, Federal Rules of Evidence. *Cf. United States v. Abel,* 105 S.Ct. at 471 ("testimony admissible for one purpose and inadmissible for another purpose" is not "rendered inadmissible").

■ In the context of this case, once the taped consistent statement of Turner comes in on credibility, there is no point in limiting it to that purpose. Since Turner was the sole government witness on the critical question of whether it was the defendant who turned over the sample, to decide Turner was credible at the trial was to decide that defendant and her colleague Onaiwu were lying and to determine the issue of guilt. That defense counsel recognized this tactical fact is revealed by his failure to object to the court's instruction to use this hearsay as evidence of guilt—albeit very carefully because of its dangers.

Failure to request a more limited instruction after being invited to do so constituted a waiver of any objection to general admissibility. *See* Federal Rules of Evidence, Rules 103(a)(1), 105.

It is well to remind ourselves that when credibility is in issue the trier should receive as much information as possible to help it decide more accurately—subject, of course, to the control of Rule 403 to prevent prejudice and undue delay in the trial. *Cf.* also Rules 608, 609, 611, 613. As the Supreme Court reminds us in another connection:

> When .... the issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight.

*Miller v. Fenton,* —— U.S. ——, ——, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985).

■ We now turn back to Rule 801(d)(1)(B) and its meaning. In the Second Circuit this rule is governed by a three-part test set forth in *United States v. Quinto,* 582 F.2d 224, 233–34 (2d Cir.1978): The statement must be consistent; it must be offered to rebut an express or implied charge against the witness of recent fabrication or improper motive, and it must have been made "prior to the time" that the purported motive to fabricate arose. The post-arrest taped statement meets all three of the *Quinto* criteria. It would thus be non-hearsay, admissible as evidence-in-chief as well as on the issue of credibility.

First, it is clearly a consistent statement: Agent Turner testified in court that defendant handed him the piece of paper towel with the heroin sample in it. The prior statement recorded on tape says the same.

Second, the defense did directly charge fabrication through its two witnesses and the nature of its cross-examination of Turner. It also impliedly charged that Turner had an improper motive that influenced him to fabricate. Onaiwu and the defendant

testified that the defendant had left the table before Agent Turner asked for the heroin sample and that Onaiwu, not the defendant, had handed over the sample. Implied in this testimony was the suggestion that Agent Turner might have structured his testimony in order to convict defendant. *See United States v. Dominguez,* 604 F.2d 304, 311 (4th Cir.1979) (impeachment of undercover operative as witness "was rife with implications that his testimony was improperly motivated"), *cert. denied sub nom. Sarmiento v. United States,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980). *Cf. United States v. Shulman,* 624 F.2d 384, 393 (2d Cir.1980) (attack on witnesses' credibility is an implicit charge of fabrication for purposes of *Quinto* test).

■ The third *Quinto* criterion—that the statement must have been made before a motive to fabricate arose—also comports with the facts of this case. It should be noted that this Second Circuit addition to the test does not appear in Rule 801(d)(1)(B) itself, and it has properly met with criticism in other circuits as an unnecessary impediment to control of the trial in a search for the truth. *See, e.g., United States v. Parodi,* 703 F.2d 768, 784–86 (4th Cir.1983); *United States v. Hamilton,* 689 F.2d 1262, 1273–74 (6th Cir.1982), *cert. denied sub nom. Wright v. United States,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983); *United States v. Parry,* 649 F.2d 292, 296 (5th Cir.1981); *United States v. Rios,* 611 F.2d 1335, 1349 (10th Cir.1979), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981). *But cf. United States v. Feldman,* 711 F.2d 758, 766 (7th Cir.) (citing *Quinto* without discussion), *cert. denied,* 464 U.S. 939, 104 U.S. 352, 78 L.Ed.2d 317 (1983). Generally, it would seem useful to drop this third element of the *Quinto* test. There is no warrant for it in the language of the rule and it unnecessarily complicates the court's problems in administering trials. Rules 401 to 403 provide a better and more flexible guarantee of fairness.

It is not difficult to isolate Agent Turner's motive to fabricate in his testimony at the trial. At the time he made the taped statement he had every reason to believe that defendant was the carrier of the heroin and had it concealed on her person. After many narcotics cases an experienced FBI agent—and for that matter a judge—will learn that dealers often do not carry the drug. They have underlings and apprentices to take that risk. Only later was it determined that Onaiwu had carried the stock of heroin. This information cooked Onaiwu's goose, but left the defendant's conviction uncertain. At that point the motive to fabricate arose in order to convict the defendant of possessing the sample. Arguably there was also an earlier motive to fabricate because the defendant had left few incriminating sounds on the tape. But this was a much lesser motive than was later presented by the lack of drugs on defendant's person when there was reason to believe she was carrying for her leader, Onaiwu.

If a government agent's desire to bolster his case after being frustrated by failing to uncover evidence against a defendant he believes guilty is a "motive to fabricate," as we think it would be in a case such as this, this motive did not exist until trial or at least until after it was discovered that the defendant did not carry the stock of heroin. Only at the trial when it became clear that both women would testify that defendant never had any drugs in her possession and knew nothing about the deal was there a clear and urgent motive to falsify. Only at the time the government was putting on its case did it become apparent that the two women would call Turner a liar with respect to the sample. Up to that point there was no overriding motive to prepare a buttressing extrajudicial statement. *See United States v. Andrews*, 765 F.2d 1491, 1501–02 (11th Cir.1985) (police officer's motive to fabricate arose only when his testimony was challenged at trial).

In such a situation, the appropriate paraphrase of the third *Quinto* criterion is that the statement must have been made at a time when the declarant did not have as strong a motive to fabricate as he subsequently had. Phrased thus, and assuming for the purpose of this opinion its current vitality, the third *Quinto* requirement is met.

■■■■ Agent Turner's statement, having fulfilled the criteria under *Quinto*, was admissible as substantive evidence under Rule 801(d)(1)(B). It was also admissible to rehabilitate Turner as a witness after the challenge to his credibility. As evidence-in-chief proving the contrary of defense testimony, the evidence also was adverse to Onaiwu's and defendant's credibility. Impeachment by using a witness "to prove a fact (material to the issue) to be otherwise than as sworn to by" the impeached witness is always permitted. *Becker v. Koch*, 104 N.Y. 394, 403, 10 N.E. 701, 704 (1887). The labeling of the statement by the court as hearsay to be evaluated with great caution eliminated any arguable prejudicial effect of this relevant and highly probative evidence.

### 2. *Excited Utterance Under Rule 803(2)*

Under Rule 803(2), a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. When a statement is offered as an excited utterance, the trial court must find two conditions: "First, there must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of an observer. Second, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought." McCormick, Evidence § 297, at 854–55 (Cleary, 3d ed. 1984). Under Rule 104(a) of the Federal Rules of Evidence, the trial court makes the determination as to the existence of excitement and the applicability of this exception.

■■■ Determination of excitement is facilitated by the recording. On tape Agent

Turner's voice is exultant—he has just completed his job, a successful arrest has been made, and the pent-up tension of his performance in the role of "Joe" has just come to an abrupt end. Testimony, and Turner's recording, depict a quick and somewhat chaotic arrest that would continue the excitement of receiving and testing the sample. Such a situation engenders excitement. Listening to the tape, the court determined that there were valid psychological guarantees against fabrication. It is not likely that the witness was deliberately fabricating evidence. He was too excited to do so.

■ The fact that the excited witness was a law enforcement agent does not preclude admissibility under the excited utterance exception. *See United States v. Boyd*, 620 F.2d 129, 132 (6th Cir.) *cert. denied*, 449 U.S. 855, 101 S.Ct. 151, 66 L.Ed.2d 69 (1980). Law officers are subject to strain and excitement, much like people in other walks of life.

3. *Present Sense Impression Under Rule 803(1)*

■ Agent Turner's statement is admissible as well under Rule 803(1). It is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed.R.Evid. 803(1).

As the Advisory Committee observed, this present sense impression exception of 803(1) and the excited utterance exception of 803(2) "overlap, though based on somewhat different theories." Notes of Advisory Committee on Proposed Rules, 56 F.R.D. at 304. Both exceptions seek to preserve the benefit of spontaneity in the narrow span of time before the chance to reflect and fabricate. For excited utterances, spontaneity exists between the individual's excitement and the speaking of the statement. For present sense impressions, the spontaneity exists in the short time between the event perceived and the declaration. *See* McCormick, Evidence § 298 at 862 (Cleary, 3d ed. 1984).

Under the Federal Rules a present sense impression need not be corroborated, but where corroborating circumstances or witnesses are available, the hearsay gains in trustworthiness and probative force. *See United States v. Blakey*, 607 F.2d 779, 785 (7th Cir.1979) (present sense impression admitted where corroborating witnesses available). The court in *Blakey* noted that "the need for such witnesses is somewhat reduced where, due to tape recording, there is no uncertainty as to the content of the declarant's statement." *Id.* at 785. In what is perhaps the leading case on the point, *Houston Oxygen Co. v. Davis*, 139 Tex. 1, 161 S.W.2d 474, 476–77 (Tex.Comm. of App. Sec. B 1942), reliance is placed on the fact that "the statement will usually be made to another (the witness who reports it) who would have equal opportunities to observe and hence to check a misstatement." *Id.* at 477 (relying on the basic work of Professors McCormick and Ray).

■ Here, this further guarantee of *Houston Oxygen* for trustworthiness is present. The statement was made in the presence of the other observer of the scene, the informer. It is highly unlikely that Turner would have fabricated on the tape when standing next to him was someone who could say—and be heard by all Turner's fellow officers to say—that Turner was mistaken about an event they both observed minutes before.

Illustrative of the Rule's application is *United States v. Andrews*, 765 F.2d 1491, 1500 (11th Cir.1985). The government there introduced in rebuttal a tape that a police officer made, recording his impressions of what he saw while looking through the defendant's window. Defendant argued on appeal that this was self-serving hearsay recorded out of the presence of the defendant, and was repetition rather than rebuttal. Both the district and the appellate courts found that this recording fell within the exception for present sense impressions.

■ Although the *Andrews* statement was somewhat more contemporaneous than

Turner's, similar circumstances create a similar guarantee of trustworthiness. Rule 803(1) provides that "immediately thereafter" must be close enough to allow an inference of spontaneity. The Advisory Committee's notes recognize that "precise contemporaniety" is often not possible. A few minutes' pause after the moment at which the statement could have been made is within the period contemplated in Rule 803(1). *See United States v. Blakey,* 607 F.2d 779 (7th Cir.1979); *United States v. Medico,* 557 F.2d 309 (2d Cir.), *cert. denied,* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977).

Where a precisely contemporaneous declaration cannot be made, near contemporaneity fulfills the requirements of 803(1). Agent Turner spoke at his first opportunity. His declaration was as spontaneous as possible: there had elapsed only two minutes and 25 seconds after the arrest and less than 15 minutes after delivery of the sample. By its nature the statement could not have been made in the presence of Onaiwu or the defendant. It was repressed and then exploded almost as a reflex as soon as Agent Turner was free to speak.

### 4. *Catchall Exception Under Rule 803(24)*

█ Even if the statement were not admissible as non-hearsay or under a specific exception it would come in under the catchall exception—Rule 803(24). Relevant statements, under Rule 803(24), are admissible if they bear "circumstantial guarantees of trustworthiness" equivalent to those of the enumerated exceptions. Agent Turner's statement falls within Rule 803(24). The guarantees of trustworthiness—enhanced by the accuracy of its contemporaneous recording—has already been demonstrated in the discussion of Rules 801(d)(1)(B), 803(1) and 803(2), *supra.* The statement was most helpful in promoting the general purposes of the Rules of Evidence: the production of relevant evidence in a fair proceeding.

█ Rule 803(24) requires notice to the adverse party before such evidence is admitted. Lack of adequate notice may render out-of-court statements inadmissible. The offer of a continance by the trial judge cures this lack of notice. *See, e.g., United States v. Bailey,* 581 F.2d 341, 348 (3d Cir.1978); *United States v. Iaconetti,* 540 F.2d 574, 578 (2d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *United States v. Leslie,* 542 F.2d 285 (5th Cir.1976). The offer was made:

THE COURT: .... I believe ... the interest of justice and the purposes of the rules of evidence ... are best served by the admission of the statement. However, that statement may not be admitted unless the proponent, here the government, makes it known to the adversary party, here the defendant, sufficiently in advance of the trial, to provide the adverse party with a fair opportunity to prepare. Here that opportunity was not given but ... I am willing to give the defendant a continuance.

Do you wish a continuance. You can still maintain your exception.... If you want a continuance, I will give it to you.

MR. WASSERSTEIN: I don't know how that can be cured by a continuance at this time. I would still maintain my exception.

\* \* \* \* \* \*

MR. GLEESON [prosecutor]: Just for the record, if I may, certainly there was notice as to the existence of the statement, because it was on tape, that was provided to counsel.

THE COURT: When was it provided?

MR. GLEESON: Well in advance of the trial. I think approximately two weeks.

THE COURT: Did you tell him you were going to use it?

MR. GLEESON: Your Honor, he did have the statement in his possession.

█ The defendant declined to accept a continance. Any objection to lack of notice was waived.

■ In retrospect, the admission of Agent Turner's taped statement appears not to have had any prejudicial impact. The verdicts of not guilty on the possession charge and the distribution charge suggest that the jury viewed Turner's testimony with appropriate caution. Although the trip to the ladies' room and the conveyance of the sample as described by Turner indicated a strong measure of control over the heroin by defendant, the jury found her guilty only of conspiracy. This highly discriminating jury did not use the statement in any way detrimental to the defendant.

### B. *Recording in Defendant's Absence from Table*

Agent Turner recorded approximately two-and-a-half minutes of conversation between himself and the informant, with defendant and Onaiwu apparently absent. This absence may be inferred by the lack of the women's voices and the nature of the conversation. On redirect the government wished to play this part of the recording, not to make the conversation known to the jury, but to show that the two ladies had left the table—presumably to prepare the sample.

Counsel for defendant was offered a choice. If the defense were willing to stipulate that the defendant and Onaiwu were away from the table during the approximately two minutes, the tape would not be played. If the defense would not so stipulate, then the two minutes would be played for the jury solely for the purpose of establishing defendant's absence during the time directly after Turner asked for the heroin sample. The defense chose to stipulate that the defendant was absent from the table.

Although the defense had to make a quick tactical decision, the stipulation was not prejudicial. After entering into the stipulation, the defense argued that the defendant had been away from the table because she had left earlier—that is, before Agent Turner suggested that Onaiwu go to the ladies' room and wrap up a sample of heroin. The stipulation did not contradict this explanation, nor did it raise any prejudicial barriers in the presentation of defendant's case.

■ Because the tape would have been played only to show defendant's absence, not for the truth of the conversation contained in it, the tape would not have been used testimonially—i.e., there could be no hearsay objection. See Fed.R.Evid. 801(a), (c). Defendant was not coerced into giving up any protection available to her through the Federal Rules of Evidence or her constitutional right to confrontation.

### C. *Letter in Onaiwu's Handbag*

A search of the codefendant Onaiwu's handbag produced a letter addressed to "Dearest Clarus" and signed "Lizzy." Government investigation established that "Lizzy" was Elizabeth Aneke, a Nigerian woman convicted of importing heroin and the letter had been written from a federal prison. Onaiwu was known as Clara to some of her friends. The letter suggested that its writer and the recipient and all the Nigerian women associated with Onaiwu in dealing in cosmetics and heroin had pledged to assist each other if they were apprehended.

At trial, the court sustained defendant's objection to the admission of the letter but allowed the government to cross-examine Onaiwu about its contents. Defendant appears to argue now that this examination was improper because Onaiwu denied being the recipient of the letter.

■ The letter was relevant and highly probative on the issue of credibility. It implied that Onaiwu was a principal among heroin dealers from Nigeria and a mentor to apprentices in her trade. Moreover, it established Onaiwu's membership in a kind of criminal sorority pledged to mutual protection. This is very much like the membership in a prison society held to be relevant on the issue of witness bias in *United States v. Abel*, —— U.S. ——, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). The Supreme Court emphasized the wide discretion afforded the trial court in ruling on such evidence

under Rules 401 to 403. It offered the following guidance with regard to the admissibility of such extrinsic evidence:

A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of common membership in any particular group, and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 and ultimately, if the evidence is admitted, for the trier of fact.

105 S.Ct. at 470.

 Here, the letter itself, though relevant, was deemed by the court sufficiently prejudicial to warrant exercise of Rule 403 discretion in favor of defendant. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. Some of the prejudicial effect stemmed from the letter's origins—"Lizzy," who signed it, is incarcerated in a federal prison—and some from its lack of circumstantial guarantees of trustworthiness.

 Admissibility of the letter was also curtailed by analogy to Rule 608(b), which excludes extrinsic evidence of specific bad acts to attack credibility but does permit cross-examination as to these acts. Although the letter did not directly prove any specific acts on the part of Onaiwu, it implied that some acts related to her credibility had taken place. For the sake of minimizing prejudice, Rule 608(b) could be applied as a guide in rulings under Rule 403. Under this approach, and to protect defendant, the letter was excluded and the cross-examination permitted.

 Denying the actual letter to the jurors while suggesting some of its contents through cross-examination struck the appropriate balance between guarding against prejudice and allowing the jury access to relevant evidence on credibility, a balancing mandated by Rule 403. The government might object that such extrinsic evidence to prove bias is admissible

under *Abel* and general doctrine. Defendant probably received more protection than she was entitled to.

Had she requested it, defendant could have introduced the letter under Rule 106 as the remainder of a writing that ought in fairness to be considered. Obviously she did not wish to do so because keeping it out prevented further erosion of Onaiwu's credibility.

### D. *DEA Information*

Defendant sought to introduce internal documents of the Drug Enforcement Administration to show that the government had long suspected Onaiwu of being a drug dealer, but had no such suspicion of defendant. This line of argument was attenuated with the ruling that these documents constituted inadmissible hearsay. Nevertheless, by cross-examination and argument defense counsel did bring this line of "proof" to the jury's attention.

Information in these documents came from DEA investigation and field reports. The documents relied on sources whose credibility and reliability were unknown, and not ascertainable through cross-examination.

The Second Circuit has made clear its policy to reject, as inadmissible hearsay, information that law enforcement agencies obtain from such external sources. In *United States v. Ocampo*, 650 F.2d 421 (2d Cir.1981), the Court of Appeals reversed a conviction because the district court had permitted a law enforcement official to identify a defendant based on information obtained from an unavailable informant. This testimony, the Second Circuit held, was not admissible under any exception to the hearsay rule. *Id.* at 428. *See also United States v. Ruffin*, 575 F.2d 346, 355–56 (2d Cir.1978) (IRS computer printout "which allegedly contained a coded notation" held inadmissible hearsay).

 Much of the force behind this policy is undoubtedly a concern for a defendant's right to be protected from amorphous *inculpatory* bureaucratic records. *See*

Notes of Advisory Committee On Proposed Rules, 56 F.R.D. at 313 (an "almost certain collision with confrontation rights ... would result from [the use of law enforcement records] against an accused in a criminal case").

 The government needs no such protection. Nevertheless, the line of proof defendant sought to construct had almost no probative force. Omissions in official documents, or implications that a defendant is unknown to a law enforcement agency, are probative of very little. If they were to be deemed admissible they might be used, as here, to inculpate one defendant at the expense of another. Distrust of this kind of multiple hearsay is equally sound regardless of which side seeks its admission. *Cf. Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability ..."). The fact that Onaiwu, but not the defendant, was known to law enforcement officers as a drug dealer proves nothing except perhaps that defendant was a neophyte or had gone undetected.

### E. *Defendant's Post-Arrest Statements*

After her arrest, defendant received full warnings derived from *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). She then told the arresting agents that she knew nothing about any heroin transaction. At trial, after Agent Turner's recordings of the table conversations had been played to the jury, defendant took a somewhat inconsistent position. She testified under cross-examination that she knew something illegal was being discussed at the restaurant meetings, but that she did not know exactly what it was. She claimed that she had denied any knowledge of a heroin transaction to protect her friend Onaiwu. The defense now characterizes the line of questioning by the government as an "abuse" of cross-examination. According to the defense argument, defend-

ant was punished at trial for exercising a fifth amendment right: the right not to explain her innocence to the arresting officers.

 Defendant mistakenly equates the constitutional right to remain silent (and the corollary right not to have the invocation referred to at trial, *see Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)) with a purported right to be privileged from cross-examination about partially exculpatory statements made after *Miranda* warnings. A defendant who takes the stand may be cross-examined about these statements; the government is allowed "proper and effective cross-examination in an attempt to elicit the truth." *United States v. Havens*, 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980).

 In *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court held that even a statement taken in violation of the *Miranda* decision could be used to impeach the credibility of a defendant who testifies. "Having voluntarily taken the stand," in the words of the Court, the defendant was "under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." *Harris*, 401 U.S. at 225, 91 S.Ct. at 645–46. In the instant case, defendant received *Miranda* warnings before she made the statements denying any knowledge of anything illegal going on. Defendant received more protection—the *Miranda* warnings—than is required under *Harris*.

 Impeachment by silence after *Miranda* warnings does violate the fifth amendment privilege against self-incrimination. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Silence, however, is not at issue here. Defendant made statements intending to exculpate herself; the attempt backfired. The *Miranda* catechism itself warns a defendant of this possibility. *See Miranda*, 384 U.S. at 469, 86 S.Ct. at 1625 ("anything said can

and will be used against the individual in court"). *Cf. Jenkins v. Anderson,* 447 U.S. 231, 239–41, 100 S.Ct. 2124, 2129–30, 65 L.Ed.2d 86 (1980) (comparing impeachment by silence with impeachment by prior statements).

### F. *Absent Witness Jury Instruction*

A confidential informant had been present at both meetings in the restaurant. Nonetheless, the government called only Agent Turner to testify to what was said at the meetings. The defense did not put the informant on the stand. It did, however, seek a jury instruction to the effect that one side's decision not to call a knowledgeable witness "peculiarly within" its control may give rise to an inference that the testimony would have been unfavorable to that side. *See* E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, § 17.19 at 565–66 (3d ed. 1977); L.B. Sand, J.S. Siffert, W.P. Loughlin, S.A. Reiss, Modern Federal Jury Instructions ¶ 6.03 (1984).

■ Throughout the trial the informant sat in the United States Attorney's Office waiting to be called by either party. He was available for interview to both sides. Defendant chose not to call him despite an offer by the court to let defense counsel interview and interrogate him outside the presence of the jury. This equal opportunity to learn the informant's testimony in advance made the witness equally available to both sides.

It is settled law in the Second Circuit that a government informant will be deemed "equally available" as a witness for the defense if the informant is made available for pretrial interview and trial testimony. *See United States v. Burgos,* 579 F.2d 747, 750 (2d Cir.1978); *United States v. Erb,* 543 F.2d 438, 444–45 (2d Cir.), *cert. denied,* 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976); *United States v. LaRocca,* 224 F.2d 859 (2d Cir.1955). *Cf. United States v. Super,* 492 F.2d 319 (2d Cir.), *cert. denied sub nom. Burns v. United States,* 416 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 115 (1974) (government informant

held "equally unavailable" to both sides for purpose of jury instruction).

■ Where a witness is equally available to both sides, the inference suggested by the defense lacks force. *See United States v. Erb,* 543 F.2d 438, 444–45 (2d Cir.) *cert. denied,* 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976); *United States v. D'Angiolillo,* 340 F.2d 453, 457 n. 5 (2d Cir.) ("It would generally be enough to say that the jury, having before it the facts with regard to the availability of the witness and his relation to the parties, may draw such inferences as [it chooses]."), *cert. denied,* 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965); L.B. Sand, et al., Modern Federal Jury Instructions, ¶ 6.04 (1985).

■ A prominent commentator agrees that in situations where an inference cannot appropriately be drawn, the court should either instruct the jury to draw what inference it chooses from the lack of testimony or give no instruction on the subject at all. *See* C. Wright, Federal Practice and Procedure, Criminal § 489 at 744 (2d ed. 1982). *See also United States v. Carr,* 584 F.2d 612 (2d Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). The lack of jury instructions here accorded with this suggestion.

■ The attempt to sort and balance the relative disadvantages of particular testimony to each side for the sole purpose of identifying an inference of weakness through absence of a witness has been well characterized in law review commentary as largely a waste of judicial resources. *See, e.g.,* Stier, Revisiting the Missing Witness Inference—Quieting the Loud Voice from the Empty Chair, 44 Md.L.Rev. 137, 150–52 (1985) (collecting sources). The missing witness rule charges should almost never be given unless a party has procured the witness' unavailability. Where this occurs, the missing witness argument is insignificant as compared to the much more powerful inference of guilty mind through spoliation. Counsel are quite capable of dealing with the probative force of such lines of

proof without having the court single them out for special emphasis.

In this case the critical commentary suggesting virtual abandonment of the proposed instruction was confirmed. The informant was a "missing witness" only because of the parties' tactical preferences. From the government's point of view the informant could add nothing to Agent Turner's testimony that would be worth the price of revealing his identity in public. The defense preferred not to introduce confirming adverse testimony. The refusal to give a missing witness instruction was appropriate.

### G. Inconsistent Verdict

The defense argues that the verdict of guilty on the charge of conspiring to distribute heroin is inconsistent with the verdicts of not guilty on the possession and distribution charges. According to the defendant, the only overt acts alleged in the indictment were acts of which she was acquitted, and the conspiracy conviction is thus in conflict with the acquittals on the substantive counts.

■ Defendant's position is contrary to both the language of the conspiracy statute and case law. The conspiracy provision of the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 846, under which defendant was convicted, does not require proof of any overt act. *See United States v. Knuckles*, 581 F.2d 305, 311 (2d Cir.1978), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1979); *United States v. Bermudez*, 526 F.2d 89, 94 (2d Cir.1975), *cert. denied sub nom. Diaz-Martinez v. United States*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). All that the government need prove to sustain a conviction of conspiracy is that defendant agreed to violate the federal narcotics laws.

■ The evidence supported the government's contention of lack of factual inconsistency. A reasonable explanation for the verdict might be, for instance, that defendant agreed to go along with her friend for the first meeting in order to assist in a heroin deal. During this meeting she possessed no heroin and played no part in distribution, but she understood the illegality of the planned transaction and agreed to be part of it. Before Onaiwu picked up the heroin in preparation for the second meeting, the defendant may have withdrawn from the conspiracy and remained with Onaiwu because she had no way to get back to their hotel. Alternatively, she may have believed, as she testified at trial, that the second meeting was "a date" with Onaiwu and two "nice looking men." Under either of these constructions, defendant would have been guilty of conspiracy and not guilty of possession and distribution, as the verdicts indicate.

■ Even if the verdicts were inconsistent, case law is clear that such an inconsistency does not justify a new trial. A similar case is illustrative. In *United States v. Powell*, — U.S. —, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), defendant was acquitted of conspiracy and possession charges but convicted of using the telephone to commit these felonies. Although, as the Supreme Court put it, these verdicts "cannot rationally be reconciled," 105 S.Ct. at 479, inconsistency was held not a ground to set aside a guilty verdict. A jury, "convinced of guilt," could have "through mistake, compromise, or lenity, arrived at an inconsistent conclusion on another offense." 105 S.Ct. at 477. *See also Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) (inconsistent verdicts may indicate only leniency on the part of the jury; reversal of conviction not necessarily warranted); *cf. Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (upholding conviction of aiding and abetting despite acquittal of principal); *Harris v. Rivera*, 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) (inconsistent verdicts at state trial do not support relief by habeas corpus).

Professor Bickel suggested that inconsistent verdicts may be a vehicle for juries to check arbitrary exercises of prosecutorial power. *See* Bickel, Judge and Jury—Inconsistent Verdicts in the Federal Courts,

63 Harv.L.Rev. 649, 652 (1950). Here the jury may have thought it excessive to charge three crimes for one transaction. In any event, although this jury's verdict, unlike that of *Powell, supra,* can be reconciled, any inconsistency that may exist does not warrant a reversal of the conviction.

### III. *Conclusion*

The motion for a new trial or for a judgment of acquittal is denied.

So ordered.