786 F.Supp. 229 (1992)
In re Subpoena of Nancy DRAKE to testify in
UNITED STATES of America
v.
John GOTTI and Frank Locascio, Defendants.
No. CR-90-1051 (S-1).
United States District Court, E.D. New York.
March 9, 1992.
*230 Laura A. Brevetti, Morrison Cohen Singer & Weinstein, New York City, for Nancy Drake.
Andrew J. Maloney, U.S. Atty., Patrick J. Cotter, Asst. U.S. Atty., for the U.S.
Albert J. Krieger, Miami, Fla., for John Gotti.
John W. Mitchell, LaRossa, Mitchell & Ross, New York City, Anthony M. Cardinale, Boston, Mass., for Frank Locascio.

MEMORANDUM AND ORDER
GLASSER, District Judge:
A witness who has been served with a subpoena to testify in this criminal matter has moved to quash that subpoena on the grounds that it is oppressive and unreasonable. In the alternative, the witness moves this court to declare her "unavailable" as a witness and to admit into evidence certain statements that she has made to a federal investigator. The government has opposed her motion to quash the subpoena but has moved this court to admit her statements under the "catch-all" hearsay exception. The government has represented that if the court should determine her statements to the federal investigator to be admissible, it will vacate its subpoena ad testificandum. The defendants have taken no position on this matter. For the reasons indicated below, this court will admit the statements made by the prospective witness into evidence under Federal Rule of Evidence 803(23). Furthermore, on the basis of the representation of the government that it will vacate its subpoena, this court will not consider the motion of the witness to quash that subpoena.

FACTS
In October of 1991, the government served on Nancy Drake a subpoena ad testificandum in the matter of United States v. John Gotti and Frank Locascio, CR-90-1051. The government has represented that it will seek to elicit testimony from Drake about her knowledge of the events surrounding the disappearance of Robert DiBernardo in early June of 1986. Drake contends that, because of her complex psychological and emotional problems, she is unable to testify about this matter.
Drake apparently had a romantic relationship with Robert DiBernardo before his disappearance on June 5, 1986. After he disappeared, agents of the Federal Bureau of Investigation (the "FBI") interviewed her on several occasions with respect to her relationship with DiBernardo, his business and social interactions, and the events immediately prior to June 5, 1986; those interviews were conducted by FBI Agent Brendan M. Balenwho transcribed his notes of these conversations into reports. The government considers the following matters to be the salient elements of Drake's statements (as contained in Agent Balen's reports):
1. Drake was dating DiBernardo in June 1986, and frequently stayed at his home.... Drake often answered telephone calls for DiBernardo from a man who identified himself as Angelo and who refused to tell Drake the purpose of his call. DiBernardo had once taken Drake to Angelo's home.
2. On the night of June 4, 1986, Angelo called DiBernardo's home. Drake answered the call and told Angelo that DiBernardo was not home. Angelo told Drake to tell DiBernardo that Angelo had called and that it was very important that DiBernardo contact and meet with "Sammy" the following day.
3. On the afternoon of June 5, 1986, Drake was in DiBernardo's home and spoke by telephone to DiBernardo, who was in his car and using a mobile telephone. DiBernardo told Drake that he had a meeting scheduled for 4:00 p.m. and that he would be at home at 7:30 in *231 order to go out to dinner at 8:00 with Drake and her sister. At 7:30, Drake called her sister to cancel the dinner.
Memorandum of Government at 3.
As a threshold matter, Drake's attorney describes those FBI interviews thus:
At all times, Drake was cooperative and forthcoming. At the time, Drake believed  and was led to believe  that DiBernardo might still be alive, and her information would help find him.
Affidavit of Laura A. Brevetti ¶ 4. However, Drake contends that after she learned that the FBI suspected that DiBernardo had been killed by organized crime  and that DiBernardo was himself believed to have been a member of organized crime Drake "became terribly frightened by the incident ... and was traumatized by these events and the prospect of danger to herself and family because of her short-lived liaison with DiBernardo." Id. Drake contends that her fear continued to grow, that she became seriously distraught, and that, accordingly, she moved away from New York (she apparently lives in Colorado now). Id. ¶¶ 5-6.
In January of 1989, the Organized Crime Strike Force for the Eastern District of New York issued a subpoena to Drake to compel her to testify before a grand jury about the disappearance of DiBernardo. The government characterizes that appearance as follows:
Drake testified before the grand jury pursuant to an order of immunity. Although she stated she could not remember much of the information contained in Agent Balen's reports of her statements, she confirmed the fact of her relationship with DiBernardo, as well as the fact that she had been staying at his home when he disappeared. She also stated that she remembered speaking with Agent Balen and that while she did not remember what she had told him during those interviews, she was "sure" that any statements she made to him were true.
Memorandum of Government at 3. Apparently, the government was not satisfied with her testimony at that time, and Drake was brought before Judge Nickerson; he admonished her that she had a duty to respond to the questions of the grand jury to the best of her ability and recollection. Affidavit of Laura A. Brevetti ¶ 7. Notwithstanding the directions of Judge Nickerson, Drake continued to assert a loss of memory about the events immediately surrounding the disappearance of DiBernardo. Id.
In May of 1990, Drake was again summoned by the government to testify before the grand jury. Prior to her scheduled appearance, Drake was interviewed by Assistant United States Attorney Patrick Cotter in an attempt to help her recall the matters about which the government sought her testimony. Id. ¶¶ 8-9. Such attempts by the government to prod her recollection continued through several hours of interviews in the summer of 1990. Ultimately, when Drake persisted in her claimed inability to recall these matters, the government did not present her to the grand jury. Id. ¶¶ 10-11.
Drake has submitted a report from Irvin A. Ebaugh, M.D., her psychiatrist, in support of her claimed loss of memory and emotional distress. Although she alleges that she has suffered from amnesia and other symptoms since the time several years ago when she first learned of DiBernardo's relationship with organized crime, she has only been under Dr. Ebaugh's care since early January of 1992. She claims that she "initially sought help [from Dr. Ebaugh] as a result of her feeling terrorized by her daughter's fatal illness and the possibility of having to testify at the trial." Id. ¶ 15.
In his report, Dr. Ebaugh notes that Drake's medical history includes a number of physical problems such as kidney failure, breast tumors, and ulcers. Affidavit of Laura A. Brevetti, Exhibit A, at 2. He also notes that she has taken several medications in the recent past for anxiety, headaches, depression, and sleeplessness. Id. His evaluation of her "mental status" determined that she was "oriented" but that her anxiety "interfered somewhat with her recent memory function...." Id. at 2-3. He observed that "[h]er mood was depressed *232 and anxious [and that] [s]he feared that she would be killed by those accused in the trial even though she knew nothing about her former boyfriend's disappearance." Id. at 3. He diagnosed Drake as having "major depression, single episode, severe, without psychotic feature...." Id. Also, Dr. Ebaugh concluded that she suffers from "post-traumatic stress disorder ... which has developed in relationship to both the situation which has evolved subsequent to the disappearance of her former boyfriend, as well as in relationship to the diagnosis of her daughter's fatal illness." Id. As to this post-traumatic stress disorder, Dr. Ebaugh states that Drake's "inability to recall some events which occurred around the time of his disappearance probably represents psychogenic amnesia...." Id.
Dr. Ebaugh's report also sets forth a course of future tests and treatment for Drake. Id. at 3-4. Finally, he concludes:
While the above further diagnostic and treatment plan may possibly be accomplished as an outpatient, it may be that Ms. Drake may have to be hospitalized in order to recover.... She is extremely fearful of testifying regarding the case in question and forcing her to do that now would, in my opinion, be a source of significant stress for her and could very well lead to significant worsening of her condition, which would necessitate hospitalization.
Id. at 4.
On the basis of the opinions and conclusion of Dr. Ebaugh, Drake moves to quash the subpoena issued by the government. In the alternative, she asks this court to declare her "unavailable" within the meaning of Federal Rule of Evidence 804(a)(4) so that her statements to the FBI may be admitted at trial under Federal Rule of Evidence 804(b)(5)without her appearance at trial. The government opposes her motion to quash the subpoena, and it opposes her motion for the court to declare her an "unavailable" witness. However, the government does move that this court determine that Drake's statements to Agent Balen should be admitted under Federal Rule of Evidence 803(24). Finally, the court inquired of the defendants whether they would take a position on the admissibility of this evidence; they initially indicated that they would submit papers to the court on the morning of March 5, 1992, but they apparently have reconsidered their desire to be heard on this question. Indeed, the government first notified the defendants by letter dated December 26, 1991 that it intended to introduce Drake's statements under Rule 803(24); thus, the defendants have enjoyed over two months in which to consider their position.

DISCUSSION
Drake has moved, as an alternative to her motion to quash, that this court declare her to be an "unavailable" witness within the meaning of Federal Rule of Evidence 804(a). Such a determination, she argues, would allow the government to move for admission of her statements to the FBI under Rule 804(b)(5); this, in turn, would render her testimony at trial unnecessary. Rule 804(a) provides, in relevant part:
"Unavailability as a witness" includes the situations in which the declarant 
. . . . .
(3) testifies to a lack of memory of the subject matter of the declarant's statement; or
(4) is unable to be present or to testify at the hearing because of ... then existing physical or mental illness or infirmity. ...
Drake asks that this court declare her "unavailable" under Rule 804(a)(4); under this provision, she would not have to testify to her lack of memory  as she would be required to do under Rule 803(a)(3). The government, however, argues that because Drake is able to testify as to those facts she indicated before the grand jury  that is, the fact of her relationship with DiBernardo, her recollection of having had interviews with the FBI, and her certainty that any statements she made to the FBI at the time were true  she is not "unavailable" under Rule 804(a)(4). Although this does not precisely address the concerns of Rule 804(a)(4), it is clear that the government *233 believes that, at the least, Drake must testify as to her inability to recall the statements she made to the FBI. That is, the government argues that, if she is unavailable at all, she is unavailable under Rule 804(a)(3)  not under Rule 804(a)(4).
This court, however, determines that Drake's statements to Agent Balen are admissible under Federal Rule of Evidence 803(24); as such, the court need not consider whether Drake is "unavailable." Cf. White v. Illinois, ___ U.S. ___, 112 S.Ct. 736, 741-43, 116 L.Ed.2d 848 (1992) ("unavailability" of witness only compelled under Confrontation Clause when out-of-court statement was made in prior judicial proceeding). Rule 803(24) provides, in relevant part, for the admissibility of:
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
This court is satisfied that these statements not only exhibit indicia of trustworthiness equivalent to those of the other hearsay exceptions under Rule 803 but also that they are material and more probative than any other source of this evidence and, finally, that the general purposes of the federal evidence rules, as well as the interests of justice, will best be served by their admission.
As the party seeking to introduce Drake's statements to Agent Balen, the government bears the burden of meeting the requirements of Rule 803(24). Cf. United States v. York, 852 F.2d 221, 225 (7th Cir.1988) (proponent of statement bears burden of demonstrating compliance with requirements of hearsay exception). Still, it is important for the court in this regard to consider that, in the words of Judge Posner: "The hearsay rule is designed to prevent the admission of unreliable hearsay but to permit through its many exceptions the admission of reliable hearsay." Ferrier v. Duckworth, 902 F.2d 545, 547 (7th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 526, 112 L.Ed.2d 536 (1990). This observation is particularly relevant in the context of Rule 803(24)  the "catch-all" hearsay exception: The question for the court on the motion of the government to admit these statements is a question of the reliability of the offered evidence.
As to the formal requirements of this hearsay exception, the government has demonstrated the materiality of the statements contained in the FBI reports. The government points out that, in his opening remarks, defense counsel advanced the "theory that the murder of Robert DiBernardo was committed by Salvatore Gravano acting without any authorization from Gotti." Memorandum of Government at 7. The government states that it seeks to introduce Drake's statements to the FBI for the purpose of showing the complicity of Angelo Ruggiero in the murder of DiBernardo. This complicity of Ruggiero will, by extension, the government contends, implicate John Gotti in this murder. Id. The court is satisfied, then, that these statements are material to pending trial.
The second requirement under these rules is that the statements sought to be introduced must be more probative on the point for which they are offered than any other evidence that the government could secure through reasonable efforts. The government has also made a sound showing on this prerequisite: The statements contained in these FBI reports  statements that, this court is satisfied, Drake cannot recall having made and which are therefore not directly obtainable from her  concern conversations between Drake and DiBernardo as well as conversations between Drake and Ruggiero. However, DiBernardo and Ruggiero are both dead, and, for the purposes of Rule 803(24), death certainly forecloses particular sources of evidence as does nothing else. Thus, it is clear that if these statements are not obtainable from Drake  who has testified under oath that *234 she cannot recall them  the only other source of this evidence is Agent Balen.
The third factor  serving the purposes of the rules and the interests of justice  is so abstruse in formulation as to constitute little guidance for the court. Perhaps a better statement of this consideration is that provided by Judge Posner: that the rules on hearsay should be read to exclude unreliable hearsay but to admit reliable hearsay. Thus, on Judge Posner's proposition, the third factor may, in part, be collapsed into what is in fact a threshold inquiry for application of Rule 803(23): the indicia of trustworthiness of the statements offered.
For these purposes, the "trustworthiness" of an out-of-court statement is established "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility...." Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 (1990). In this regard, the government invites the court to consider Drake's statements to Agent Balen against the analytical background of one of the "firmly rooted" hearsay exceptions  Rule 803(5). That rule provides for the admission of:
A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.
The government argues that, had the statements in the FBI reports been "adopted" by Drake, the content of these reports would come squarely within Rule 803(5) and would be admissible. Thus, the government argues, all the indicia of trustworthiness attendant to a statement admitted under Rule 803(5) are present in this case: The only difference is the matter of adoption  a matter which goes not to the trustworthiness of the statement, the government asserts, but to the accuracy of Agent Balen's transcriptions.
On this point, the argument of the government is not entirely persuasive: The reliability and the accuracy of Agent Balen's transcriptions do implicate the trustworthiness of the statements that the government will seek to admit. Although the government is correct that the defendants will have at trial an adequate opportunity to cross-examine Agent Balen about the accuracy of his reports, it is plain that  as records of Drake's own recollections  those reports would be still more trustworthy if Drake had "signed off" on their content as true and accurate. Thus, the trustworthiness of these statements will have to be located in part elsewhere than in the standards of Rule 803(5).
Rather, the relevant indices of reliability include, as the government correctly argues: the fact that the interviews between Drake and Agent Balen were conducted within a few days and a few weeks of DiBernardo's disappearance; that the statements (which were voluntarily given by Drake) are very specific; that the statements were  on Drake's own account  intended to be helpful to the FBI in locating her boyfriend (whom she believed to be alive); and that she has subsequently testified that she was "sure" that the content of her remarks to Agent Balen was truthful. See, e.g., United States v. Lyon, 567 F.2d 777, 784 (8th Cir.1977), cert. denied, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978) (trustworthiness of FBI agent's transcribed interview with witness "guaranteed by [agent's] detailed testimony about how he took [the witness'] statement and transcribed it"); United States v. Obayagbona, 627 F.Supp. 329, 340 (E.D.N.Y.1985) (Weinstein, C.J.) (contemporaneous recording serves as guarantee of trustworthiness under Rule 803(24)). Compare United States v. Romo, 914 F.2d 889, 896 (7th Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991) (offhand, conclusory remark in police report that individual "deals in stolen property" found not trustworthy).
*235 Taken together, these facts "render the declarant [that is, Drake] particularly worthy of belief." Wright, 110 S.Ct. at 3149. The recency of her statements after the events that they concern establishes that her recollection of those events was fresh when she spoke with Agent Balen. The fact that her statements were voluntarily made to the FBI in an effort to help that organization locate her missing boyfriend demonstrates not only the absence of any motive for fabrication but also a compelling reason for candor. Finally, that Drake has subsequently testified that she is certain that any statements she made to Agent Balen were true removes any remaining doubt as to the honesty with which she proceeded in those interviews. These indices satisfy the court that Drake's "truthfulness is so clear ... that the test of cross-examination would be of marginal utility" and, therefore, that the statements sought to be offered by the government are sufficiently trustworthy that they may be admitted under Rule 803(24). Further, such "reliable hearsay" has, of course, the effect of promoting the truth-seeking function of a criminal trial and, therefore, ought to be presented to the finders of facts in this matter.
Finally, Rule 803(24) requires advance notice to the adverse party of the intention of the proponent to offer the statement into evidence:
[A] statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the defendant.
The purpose of this notice requirement in the "catch-all" hearsay exception is to allow the party against whom the statement is offered an adequate opportunity in which "to attack the trustworthiness of" the statement. Piva v. Xerox Corp., 654 F.2d 591, 596 (9th Cir.1981). And, although other circuits have permitted a proponent to offer a statement under Rule 803(24) even when the proponent did not give pretrial notice of his intention to offer the statement  see, for example, Piva, 654 F.2d at 596  the Second Circuit has stood by the literal meaning of Rule 803(24). United States v. Ruffin, 575 F.2d 346, 358 (2d Cir.1978) (Rule 803(24) "can be utilized only if notice of an intention to rely upon it is given in advance of trial.") Accordingly, in order to offer Drake's statements under that "catch-all" exception, the government must have put the defendants on notice prior to the beginning of this trial that they would seek to introduce her statements to Agent Balen into evidence. But, as noted above, the government informed the defendants in December of 1991  approximately one month before jury selection in this trial began  that it intended to introduce Drake's statements as an exception to the general rule that excludes hearsay. Such early notification not only satisfies the somewhat arbitrary deadline of Rule 803(24) and of Ruffin, but, more importantly, it gave the defendants an adequate period of time in which "to attack the trustworthiness" of Drake's statements. Accordingly, the final requirement of Rule 803(24)  timely notification of intention to offer the statement in question  has been discharged by the government.

CONCLUSION
For the reasons set forth above, the statements of Nancy Drake to FBI Agent Balen are admissible under Federal Rule of Evidence 803(24).
SO ORDERED.