UNITED STATES of America, Plaintiff,

v.

Wilson Alejandro MEJIA-VELEZ, Defendant.

No. 92 CR 963.

United States District Court, E.D. New York.

June 15, 1994.

Susan Kellman, New York City, for defendant.

Zachary Carter, U.S. Atty., E.D.N.Y., Brooklyn, NY by Eric Friedberg and Julie Katzman, Asst. U.S. Attys., for U.S.

*MEMORANDUM*

KORMAN, District Judge.

Wilson Alejandro Mejia–Velez ("Velez") was convicted after a jury trial of murdering, for money, Manuel de Dios Unanue ("de Dios"). *See* 18 U.S.C. § 1958 (1988 & Supp. II 1990). Prior to trial, the United States Attorney made a motion *in limine* seeking admission, *inter alia*, of (1) testimony of the defendant's accomplices that they asked him to be the triggerman because he had told them he had committed similar crimes in Colombia and (2) tapes of "911" telephone calls made contemporaneously by two eyewitnesses to the homicide. Moreover, during the course of the trial, defendant sought to offer several statements allegedly made by a co-conspirator, subsequent to the murder, regarding the identity of the real killer of de Dios. While defendant sought the admission of these statements without actually calling the declarant to testify, he was "available" to testify at trial, if the defendant had chosen to call him.

The purpose of this memorandum is to set forth formally and in somewhat greater detail the reasons for admitting the evidence of prior similar acts and the recordings of the 911 calls, and the reasons for excluding the hearsay statements of defendant's co-conspirator. The following summary of the evidence is necessary to provide an appropriate context for discussion of the legal issues.

On March 11, 1992, de Dios, a journalist and former editor of New York's largest Spanish daily publication, was shot in the head and murdered as he sat having a drink at a Queens, New York restaurant. The

evidence revealed that de Dios was killed at the insistence of the "Cali Cartel," an association of crime families based in Cali, Colombia, that deal in narcotics. Because of his scathing exposes on the inner-workings of the cartel, de Dios was singled out for execution by Jose Santa Cruz Londono ("Londono"), head of the "Santa Cruz Family" of the cartel. In November 1991, from Cali, Londono issued a contract pursuant to which he offered $50,000 for de Dios's death.

Londono revealed the murder contract to his aid, Guiellermo Leon Restrepo Gaviria ("Gaviria"), who first decided to appropriate $30,000 worth of the bounty for himself. Gaviria then delegated responsibility for assigning the contract, now valued at $20,000, to one John Harold Mena ("Mena"), head of the "New York Office" of the Santa Cruz Family. Mena, although an experienced killer himself, offered the contract to a colleague from a prior homicide, Juan Carlos Velasco ("Velasco"). The evidence revealed that although Velasco had accepted the contract, he was forced to abort several inopportune attempts to murder de Dios.

In February 1992, several months after he had first issued the contract, Londono became impatient. When this fact was ultimately communicated to Velasco, via Mena, Velasco decided to "subcontract" the job. After meeting his friend Jose James Benitez ("Benitez") at a pool hall in Queens, Velasco offered Benitez the contract for $15,000, keeping $5,000 for himself. According to Benitez, Velasco did not relate to him the identity of the intended victim. Rather, Velasco is supposed to have said only that the target was "some guy who owe[d] [Velasco] money from drugs." Tr.Vol. IV at 103.

Benitez undertook the assignment together with a companion of his, Elkin Farley Salazar ("Salazar"). Although, according to Benitez, both he and Salazar were willing to conspire to murder, the two men sought a third individual to actually "pull the trigger." Tr.Vol. IV at 96. Salazar then suggested that the defendant, an acquaintance of his, be hired to commit the murder. Benitez

agreed. According to both Benitez and Salazar, the reason that they enlisted the defendant to carry out the deed was because the defendant had previously expressed a desire to engage in criminal work, and specifically had boasted to Salazar that in Colombia he, that is Velez, had participated in homicides. *See* Tr.Vol. II at 84–85 (Test. of Salazar); Tr.Vol. IV at 95 (Test. of Benitez).

The day of the murder, the three men—Benitez, Salazar and Velez—were given the details of their assignment by Velasco's common-law wife, Diane Elizabeth Castano ("Castano"). Castano showed the men a photograph of de Dios, and took the three to a restaurant in Queens, the Meson Asturias, where she told them de Dios was a frequent patron. When they arrived at the restaurant, Benitez and the defendant went inside to get a view of their target. Satisfied that they had seen him at the bar, the men exited the restaurant, and set out to prepare for the murder.

The weapon, a 9 millimeter Baretta, was procured by Salazar, who testified that he borrowed it from a friend. *See* Tr.Vol. II at 95. According to Salazar and Benitez, at Benitez's home the defendant prepared for the murder by covering his fingers with tape, and cleaning the weapon. *See id.* at 109 (Test. of Salazar); Tr.Vol. IV at 112 (Test. of Benitez). Benitez gave the defendant a grey hooded sweatshirt to wear, and the three then returned to the Meson Asturias. They parked nearby the restaurant and, according to Salazar and Benitez, the defendant then exited the car with the gun, and headed for the restaurant to commit the murder. Salazar and Benitez testified that they remained in the car. *See* Tr.Vol. II at 112 (Test. of Salazar); Tr.Vol. IV at 113 (Test. of Benitez). When the defendant returned to the car, he announced that it was "done," and the three men drove off. *See* Tr.Vol. II at 114 (Test. of Salazar); Tr.Vol. IV at 114 (Test. of Benitez).

The following day, Salazar and Benitez disposed of the gun by throwing it into Hallet's Cove, a small channel in the East River.[1] That same day, Castano received the

---

1. Parts of a firearm were recovered from the water precisely where Salazar and Benitez had

previously said they had disposed of the murder weapon. *See* Tr.Vol IV at 51–53. Ballistics tests

balance of $20,000 from Mena (minus some previously-advanced amounts). *See* Tr.Vol. I at 120. A total of $15,000 was given by Castano to Salazar and Benitez, in satisfaction of their agreement with Velasco. *See* Tr.Vol. II at 123 (Test. of Salazar); Tr.Vol. IV at 126 (Test. of Benitez). According to Salazar, several days after the murder he drove with a friend, named Francisco Ochoa, to the defendant's home in Staten Island and delivered the defendant his share of the money. *See* Tr.Vol. II at 127–32. Salazar's testimony in this regard was corroborated by Ochoa, who testified that after the murder, which he learned about from television, he accompanied Salazar on a car ride to Staten Island, and witnessed Salazar hand something to the defendant, which Salazar later told Ochoa was money. *See* Tr.Vol. IV at 17.

The jury also heard testimony from two eyewitnesses who claimed that they saw de Dios's killer. While they were not able to identify the defendant as the shooter, the descriptions they gave were consistent with the physical appearance of the defendant. The first, John Martin Gajewski ("Gajewski"), testified that as he was walking down 83rd Street, approaching the Meson Asturias, he saw a man cross his path, withdraw a gun, and enter the vestibule of the restaurant with his arm raised. *See* Tr.Vol. V at 108–09. Gajewski heard two shots from inside the restaurant as he saw the man stand with his arm raised in the vestibule. *Id.* Gajewski then saw the man run out of the restaurant and across the street. *Id.* After witnessing this incident, Gajewski testified that he proceeded to the first telephone he could find, and "within three or four minutes," placed a call to "911." *Id.* at 111. In this call, Gajewski described the man with the gun as follows: "very, very thin.... I think white.... about five ten, wearing sneakers, a gray sweatshirt with the hood up, and white dungaree-type tight pants." Gov't Ex. 33b at 2. Sixteen minutes later, Gajewski called 911 once again, and gave the same description. Gov't Ex. 33d at 3.

The second eyewitness was Jose Maria Aguera ("Aguera"), the owner of the Meson Asturias, who was working behind the bar at the moment de Dios was shot. Aguera testified that as de Dios sat at the bar, a man entered the restaurant, approached and then shot de Dios from behind. *See* Tr.Vol. VI at 83. At trial, Aguera described the shooter as a man in his twenties, clean shaven and without a moustache, with skin of "a light color" and wearing a gray-hooded shirt. *Id.* at 84–85. Immediately after the shooting, Aguera likewise placed a call to 911, describing the assailant as a male Hispanic, wearing a "white and gray" shirt. Government Ex. 35b at 3–4.

At his arrest, over one year after the shooting, the defendant spoke with police detective Oscar Hernandez ("Hernandez"), who testified at trial. According to Hernandez, the defendant stated i) that he discussed the prospect of committing a homicide with Benitez; ii) that he drove to the "Meson" restaurant with Benitez and another individual (matching Salazar's description); iii) that Benitez and the other individual exited the car two blocks from the restaurant; iv) that when the two individuals returned to the car, Benitez took a gun out of his shirt and threw it on the floor; v) that the defendant then asked the two others "what happened" without receiving a reply; and vi) that the defendant did not receive any money in connection with the killing of Manuel de Dios. *See* Tr.Vol. VII at 56–58.

## DISCUSSION

### I. *Similar Acts of the Defendant*

On January 31, 1994, at a pretrial hearing, I held that Salazar and Benitez, the two accomplices that had recruited the defendant as the triggerman, could testify that they did so because the defendant had told them that he had been involved in the commission of homicides in Colombia. This evidence was highly probative because it enabled Salazar and Benitez to explain why it was that defendant, at the time a seventeen

---

confirmed that the recovered components were in fact parts of the gun that was used to kill de

Dios. *See* Tr.Vol VI at 15–18.

year old chair-factory worker, was chosen by them to participate in a homicide.

Specifically, Salazar testified that the defendant had told him that he was eager to earn some money and was therefore "willing to do a robbery, a death or a drug job." Tr.Vol. II at 85. Salazar clarified that a "death" meant a "murder." *Id.* at 86. Salazar also testified that the defendant had told him that he, that is the defendant, had been "involved in deaths" in Colombia. *Id.* at 84. Salazar did not elaborate on the details of any of these "deaths." Benitez testified that, while he and Salazar discussed the prospect of committing a murder, both men expressed an aversion to physically carrying out the deed. Tr.Vol. IV at 91. It was Salazar who then suggested that they contact the defendant because, according to Benitez, Salazar said that the defendant "had killed a lot of people in Medillin." Tr.Vol. IV at 95.

These statements were not offered for their truth—that is, to show that the defendant did, in fact, commit homicides in Colombia. *See United States v. Foster,* 939 F.2d 445, 449, 455 (7th Cir.1991) (verse written by defendant boasting that he was "the biggest Dope Dealer" was admitted not for truth, but as evidence of narcotics defendant's knowledge and intent); *United States v. Ventura,* 936 F.2d 1228, 1233 (11th Cir.1991) (defendant's statements to co-conspirator not "admitted for their truth or as extrinsic act evidence; [defendant's] statements indicate that he held himself out to be an experienced drug dealer and demonstrate that he wanted to engage in the illegal transaction"). Nor were they offered to portray the defendant as the kind of person who would be likely to commit homicides. *Cf. United States v. Williams,* 985 F.2d 634, 637 (1st Cir.1993) (reversing conviction for drug offenses where defendant's statement that "he had killed a couple of people" was admitted simply as evidence of defendant's bad character).

Rather, defendant's statements to Salazar and Benitez were offered to explain why this defendant was chosen to partake in a contract murder. *See United States v. Roldan–Zapata,* 916 F.2d 795, 804 (2d Cir.1990) (prior act evidence admissible to " 'help[ ] explain to the jury how the illegal relationship between [participants in the crime] developed' " (citation omitted)), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991); *United States v. Dworken,* 855 F.2d 12, 26–27 (1st Cir.1988) (defendant's statements boasting of prior drug transactions were admissible to explain context and nature of relationship between defendant and individual thought by defendant to be a drug operative).[2]

That the statements were relevant and not offered "to prove the character of a person in order to show that he acted in conformity therewith," Fed.R.Evid. 404(b), does not end the inquiry. Prior act evidence will only be admissible where the probative value of the evidence is not substantially outweighed by its prejudicial effect. *See Huddleston v. United States,* 485 U.S. 681, 691, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). To be sure, the potential for unfair prejudice is very real in any case in which the defendant is said to have admitted to prior homicides. Under the circumstances here, however, the prejudice to the defendant was more theoretical than real.

The evidence of prior acts here came from the same witnesses who testified that they hired the defendant to carry out the murder. If the jury found these witnesses to be credible, the defendant would be convicted even if the accomplices were not permitted to testify about defendant's admission of prior homicides. On the other hand, if the jury did not find their testimony to be credible with respect to the crime in issue, there is no reason why it would have credited the testimony of these witnesses with respect to the prior acts.

Prejudice, could have only resulted from evidence of the prior acts here if that evi-

---

2. While the pretrial ruling regarding the relevance of this evidence focused on the need of the accomplices to explain why they chose to hire the defendant, at trial it became apparent that this evidence was also relevant to rebut the defense that although the defendant was conceded-ly present at the scene of the homicide, he simply did not intend to commit a murder that evening. Tr.Vol. I at 50, 57–58 (defendant's opening statement). *See United States v. Myerson,* 18 F.3d 153, 166 (2d Cir.1994).

dence was of a kind that enhanced the credibility of the accomplices. In the present case, for example, if prior act evidence came from a surreptitiously taped recording of the defendant acknowledging the commission of contract killings, it would have significantly enhanced the credibility of the accomplice's testimony because it would have unimpeachably demonstrated the predisposition of the defendant to commit the crime they say he committed here. *Cf. Dworken*, 855 F.2d at 27 (admitting tape-recorded conversations of defendant's statements regarding prior bad acts).

The prior act testimony here was not of that quality. Instead, it was subject to the same devastating impeachment as the testimony regarding the defendant's commission of the crime with which he was charged, namely, that the witnesses were testifying falsely to avoid the life sentence, if not the death penalty, they faced themselves. There was nothing about the prior act testimony that rebutted this claim of fabrication. The testimony that the defendant admitted to other homicides enhanced the credibility of the accomplices only because it provided a plausible answer to the question of why they recruited the defendant to be the triggerman. The use of the prior act evidence for this purpose, however, was entirely proper.

There is another reason here that further diminished the prejudicial effect, if any, of this evidence. In the context in which the defendant was alleged to have made the statements, the jury easily could have found that he was merely boasting or "puffing" to his friend Salazar, who had just spoken to the defendant about his own criminal history. *See* Tr.Vol. II at 81; *Ventura*, 936 F.2d at 1233. Indeed, during the course of the trial, the jury heard testimony from one witness, Benitez, who admitted that in the company of other criminals he often boasted of his own criminal past, and in fact had falsely represented that he had killed people. *See* Tr.Vol. IV at 104, 178.

The charge to the jury, which explained the limited purpose of the prior act evidence and cautioned the jurors against drawing any inferences from the evidence about the defendant's "propensity" to engage in criminal acts, likewise emphasized the possibility that the defendant may have been only boasting. The jury was charged, in pertinent part, as follows:

During the trial, ladies and gentlemen, Elkin Farley Salazar testified that the defendant told him that he, that is the defendant, had committed other murders in Colombia. Salazar testified that this was the reason that he asked the defendant to commit the murder of Manuel de Dios Unanue.

This testimony was admitted only because it enabled Salazar and Benitez to provide their complete version of how they alleged this crime came to be committed and how it was carried out. The fact that the defendant told Salazar that he committed other crimes—and it is for you to decide whether Salazar is testifying truthfully about this conversation, does not mean that the defendant has, in fact, committed other homicides in Colombia. Indeed, you have heard at least one witness in this case testify that he has falsely claimed to have committed such crimes.

More significantly, even if there was evidence the defendant may have committed other crimes in Colombia, I say to you in the strongest possible terms that the defendant is not on trial for committing any acts not alleged in the indictment. Accordingly, you may not consider this evidence of other crimes as a substitute for proof that the defendant committed the crime charged, nor may you consider this evidence as proof that the defendant has a criminal personality or bad character.

The evidence of the other crimes was admitted for a much more limited purpose and you may consider it only for that limited purpose. Evidence of similar acts may not be considered by you for any other purpose. Specifically, you may not use this evidence to conclude that, because the defendant committed the other acts, he must also have committed the acts charged in the indictment.

Tr.Vol. IX at 158–9.

In *Huddleston*, the Supreme Court held that similar act evidence may be admissible, provided that i) the evidence is offered for a

proper purpose; ii) the evidence is relevant; iii) the probative value of the evidence is not substantially outweighed by its prejudicial effect; and iv) the trial judge, where requested, issues a limiting instruction to the jury. 485 U.S. at 691, 108 S.Ct. at 1502; *United States v. Colon,* 880 F.2d 650, 656 (2d Cir. 1989). These criteria were all satisfied here.

## II. *The 911 Tapes*

■ At trial, the jury heard testimony from two witnesses, John Gajewski and Jose Aguera, who were both at the scene of the shooting and who, moments thereafter, placed telephone calls to "911." The United States Attorney was also permitted, over objection, to introduce audio-taped recordings of the emergency telephone calls. The recordings were admitted as "present sense impressions" pursuant to Fed.R.Evid. 803(1), and as "excited utterances" pursuant to Fed. R.Evid. 803(2).

Rule 803(1) of the Federal Rules of Evidence provides an exception to the general rule against hearsay for any statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." The theory behind this exception is essentially twofold. First, the immediacy requirement reduces the opportunity for reflection, and thus minimizes the likelihood of deception or fabrication on the part of the declarant. *See* Fed.R.Evid. 803(1) Advisory Committee Note ("substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation"); *United States v. Medico,* 557 F.2d 309, 315 (2d Cir.), *cert. denied,* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977). Secondly, immediacy also greatly reduces the likelihood that the declarant will have inaccurately remembered the event in question. *See United States v. Blakey,* 607 F.2d 779, 785 (7th Cir.1979); 4 David W. Louisell & Christopher B. Mueller, *Federal Evidence,* § 437, at 483 (1980).

By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be "substantially contemporaneous" with the event in question. *See* Fed.R.Evid. 803(1); *see also* 4 Louisell & Mueller, § 437 at 487–491. In the instant case, these requirements are amply satisfied by the 911 telephone recordings.

The statements made on these recordings clearly describe the events perceived by the telephone callers. Gajewski and Aguera each describe the fact that there had been a shooting. Both men give the location and a description of the assailant. Moreover, it is certain that both callers witnessed the events that they describe. There was simply no reason for them to telephone 911, other than to report the shooting. Finally, the telephone calls were "substantially contemporaneous" with the shooting, within the meaning of Rule 803(1). The Advisory Committee Notes to the rule expressly recognize that "in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable" between the event perceived and the declarant's statement. Fed. R.Evid. 803(1) Advisory Committee Note. Courts applying Rule 803(1) have noted that "[t]here is no *per se* rule indicating what time interval is too long." *Blakey,* 607 F.2d at 785.

In the instant case, Aguera's phone call was placed immediately after the murder, from the very room where the shooting took place. In fact, the call was made so hastily that, due to the confusion following the shooting, in the middle of the conversation Aguera had to pick up the receiver in an adjacent room so that he could hear the operator more clearly. *See* Tr.Vol. VI at 88. The first call made by Gajewski was received by the 911 dispatcher just two minutes after the end of Aguera's call. Gajewski testified that immediately following the shooting, he signalled to the patrons inside the restaurant that he would call for help and then sought the first available telephone. *See* Tr.Vol. V at 109–11. Because there was just a "slight lapse" between the shooting and the placing of these two phone calls, both of these calls meet the "contemporaneity" requirement of Rule 803(1). *See United States v. Campbell,* 782 F.Supp. 1258, 1260 (N.D.Ill.1991) (admitting, pursuant to Rule 803(1), tape recording

of 911 call made "almost immediately after" drug store shooting).

The second call placed by Gajewski was admittedly 16 minutes after the completion of his first call. This call, however, was also made without any motivation for fabrication on Gajewski's part. Indeed, his recitation of the event was consistent with his first call and with the other testimony in the case. *See United States v. Parker*, 936 F.2d 950, 954 (7th Cir.1991) (admission of statements under Rule 803(1) "buttressed by the[ir] intrinsic reliability"). Under these circumstances, the interlude between the shooting and Gajewski's second call falls sufficiently within the time period permitted by Rule 803(1). *See Blakey*, 607 F.2d at 785–86 (applying rule where interval was potentially 23 minutes); *United States v. Obayagbona*, 627 F.Supp. 329 (E.D.N.Y.1985) (Weinstein, J.) (applying rule where interval was 14 minutes and 25 seconds); *cf. Hilyer v. Howat Concrete Co., Inc.*, 578 F.2d 422, 426 n. 7 (D.C.Cir.1978) (statement made between 15 and 45 minutes after event inadmissible under exception). The requirements of Rule 803(1) were therefore satisfied by each of the three telephone recordings in this case.

Moreover, even if the calls were not significantly contemporaneous to meet the present sense exception to the hearsay rule, they were admissible as "excited utterances." *See* Fed.R.Evid. Rule 803(2). Pursuant to Rule 803(2), exited utterances are·defined as those statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

As the Advisory Committee Notes indicate, the present sense impression exception and the excited utterance exception "overlap, though based on somewhat different theories." Fed.R.Evid. 803 Advisory Committee Note. The theory behind the excited utterance exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." *Id.* The two conditions for the application of this exception are that there has been a startling event and that the offered statements were made during the period of excitement, and in reaction to that event. *See Obayagbona*, 627 F.Supp. at 338; 4 Louisell & Miller, § 439 at 494–95.

It is clear that the recordings in the instant case satisfy both requirements of the excited utterance exception. A shooting, even in this day and age, is a startling event. Moreover, the sheer panic in the voices of Gajewski and Aguera, heard on the recordings, is proof that the calls were made while the declarants remained under the excitement of the situation. *See Obayagbona*, 627 F.Supp. at 338 (court's "[d]etermination of excitement [was] facilitated by [a] recording").

Nor are there any reasons of policy here, to exclude this evidence. The memory of the witnesses was ensured by the temporal proximity of the calls to the time of the shooting. The ability of the witnesses to communicate what they thought they observed was evident from their straightforward and detailed statements describing the shooter. Moreover, because the 911 calls were recorded, there is absolutely no doubt that the statements at issue in this case were actually made. *See Blakey*, 607 F.2d at 785. The only question arguably raised by the testimony of Gajewski and Aguera is whether these men accurately perceived what they described to the operators. Because both witnesses testified at trial, the defendant had ample opportunity on cross examination to explore any shortcomings in their perceptions.

The fact that the statements are not barred by the hearsay rule, however, does not foreclose the possibility that they are inadmissible on some other ground. Accordingly, defendant argued that the 911 tape recordings were more prejudicial than probative, and therefore should have been excluded pursuant to Rule 403. *See* Fed.R.Evid. 403. In support of his claim of prejudice, defendant argued that the 911 recordings would be "cumulative" of the in-court testimony, and "improper bolstering" the witnesses, leading the jury to believe that the accounts offered on the excerpted 911 tapes were the only eyewitness accounts of de Dios's murder. *See* Defendant's Memoran-

dum of Law in Opposition to the Government's Motions *In Limine* at 19.

These arguments are without merit. In the context of the prosecution's case, which consisted of primarily the testimony of three admitted co-conspirators to the murder, the observations of the shooting made by Gajewski and Aguera were extremely probative. These two men were disinterested witnesses who both significantly corroborated the accounts of the (admittedly self-interested) cooperators. Thus the testimony of the eyewitnesses was critical. The playing of the 911 tapes was not "bolstering" or "cumulative." On the contrary, the statements contained therein were the most probative evidence available of what those witnesses observed on March 11, 1992—two years prior to their in-court testimony. Indeed, in this respect the statements were closely analogous to prior eyewitness identifications, *see* Fed.R.Evid. 801(d)(1)(C), that are not deemed to be hearsay because they are made " 'relatively soon after the offense, while the incident is still reasonably fresh in the witness' mind' and 'before his recollection' has been dimmed by the passage of time." 4 Louisell & Mueller, § 421 at 205 (quoting congressional reports on Rule 801(d)(1)(C)).

### III. *Velasco's Statements*

■ In explaining how it was that he acquired the contract to murder de Dios, Benitez testified that his friend Velasco offered him the job after the two men met by chance at a pool hall in Queens. *See* Tr.Vol IV at 102–103. Benitez further testified that while standing in the pool hall with Velasco, after the men had already agreed on the terms of their contract, another individual approached Velasco expressing a desire to "do the job." Velasco answered that man, according to Benitez, by rejecting his offer and stating that the job had been given to Benitez. *See* Tr.Vol IV at 103, 182.

After the testimony of Benitez, the defendant's attorney sought to introduce in evidence statements allegedly made by Velasco to a confidential informant ("CI"). In the

first of these statements, Velasco is alleged to have said that the person who actually murdered de Dios is back in Colombia. *See* Tr.Vol. IV at 193–95 (colloquy). Velasco's statement that the shooter of de Dios was back in Colombia, defendant argued, was inconsistent with the remark that was attributed to him in the pool hall, when, according to Benitez, Velasco told a passerby that he had given the murder job to Benitez. The statement regarding the shooter was therefore admissible, argued counsel, for impeachment purposes pursuant to Rule 806. *See* Fed.R.Evid. 806 (credibility of hearsay declarant may be attacked as if declarant had testified as a witness).

Rule 806 provides, in pertinent part, that "[w]hen a hearsay statement, or a statement defined in Rule 801(d)(2) ... (E), has been admitted in evidence, the credibility of the declarant may be attacked ... by any evidence which would be admissible for those purposes if declarant had testified as a witness." Fed.R.Evid. 806. As the Advisory Committee notes make clear, the theory of the rule is that because a hearsay declarant "is in effect a witness," his or her credibility "should in fairness be subject to impeachment and support" as if the declarant had actually testified at the proceeding in question. *See* Fed.R.Evid. 806 Advisory Committee Note. A party is allowed no greater latitude in impeaching a hearsay declarant pursuant to Rule 806, than the party would otherwise be permitted by the rules of evidence in impeaching a witness that testified at trial. *See United States v. Finley*, 934 F.2d 837, 839 (7th Cir.1991) ("Rule 806 extends the privilege of impeaching the declarant of a hearsay statement but does not obliterate the rules of evidence that govern how impeachment is to proceed.").

Although the statement attributed to Velasco at trial qualifies as one made by a declarant within the meaning of Rule 806[3], the additional statement offered by defendant, ostensibly for impeachment purposes, was inadmissible for two reasons. First, the statement proffered by defendant was simply

---

**3.** Because Velasco's statements were offered as those of a co-conspirator in furtherance of the conspiracy, pursuant to Fed.R.Evid. 801(d)(2)(E), the statements, although "not hearsay," are nonetheless included within the mandate of Rule 806. *See* Fed.R.Evid. 806.

*not* inconsistent with Velasco's prior statement. According to Benitez's testimony, Velasco rebuffed a prospective contract killer by telling him, "I gave the contract to [Benitez]." Defendant would impeach that statement of Velasco's with his subsequent statement to the CI, to the effect that "the shooter of de Dios is Colombia." Those two statements are not contradictory. Velasco's awarding the murder contract to Benitez is distinct from the independent event of the killing. Indeed, the prosecutor's theory of the case assumes that Velasco gave the contract to Benitez, but that defendant *Velez* carried out the shooting. While it is true that statements offered for impeachment purposes " 'need not be diametrically opposed,'" *United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir.1988) (citation omitted), before admitting such evidence the trial court "must be persuaded that the statements are indeed inconsistent." *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975). Where inconsistency is not demonstrated, the putative impeachment evidence must be rejected. *Id.; see also United States v. Leonardi*, 623 F.2d 746, 756–57 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980).

Secondly, even if Velasco's latter statement was inconsistent with his earlier one, it was not admitted because the probative value of the latter statement was substantially outweighed by its prejudicial effect. Although Rule 806 "does not set forth a test of probative value," *United States v. Friedman*, 854 F.2d 535, 570 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), it remains the duty of the trial court to weigh all evidence offered pursuant to Rule 806 by the familiar principles of relevance and the probative-prejudice balancing test. *See Vaughn v. Willis*, 853 F.2d 1372, 1379 (7th Cir.1988).

While defendant's attorney purported to offer Velasco's statement that the shooter was in Colombia for the purpose of impeaching the statement of Velasco that he gave the murder job to Benitez, *see* Tr.Vol. IV at 199, it was obvious that counsel really sought to admit the statement solely for its truth—that is to show that the shooter was in Colombia

and, therefore, was not the defendant. The defendant did not seriously challenge the fact that Velasco gave the murder job to Benitez, and the evidence on this score was overwhelming. Indeed, in her opening statement, defendant's counsel stated, referring to Benitez and Salazar, "they brought my client there [to the scene of the murder] for a reason, members of the jury. And that reason was so that they'd have someone to point their finger at." Tr.Vol. I at 50. Under these circumstances, it was clear that the purpose of the proffered evidence was not to impeach the credibility of Velasco's statement. Rather, as I stated to defendant's counsel at trial:

> [Y]ou want the jury to believe that the person who pulled the trigger left the United States, and therefore it's not your client. That's the real use that you want to make of it. You want it to be used for its truth, not viewed realistically to impeach the credibility of the statement that [Velasco] hired [Benitez] to do the job....

Tr.Vol. V at 75. The statement was thus not offered for a proper impeachment purpose. *See United States v. Graham*, 858 F.2d 986, 990 n. 5 (5th Cir.1988) ("[T]he hallmark of an inconsistent statement offered to impeach a witness's testimony is that the statement ... is not offered for the truth of the matter asserted ... rather, it is offered only to establish that the witness has said both "x" and "not x" and is therefore unreliable."), *cert. denied*, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989).

■ There were other statements allegedly made by Velasco, which defendant sought to admit in evidence, to the effect that Velasco himself killed de Dios. The defendant first argued that these statements were admissible for their truth, even absent Velasco's in-court testimony, pursuant to Fed. R.Evid. 804(b)(3) (hearsay exception for statement against interest of unavailable declarant). *See* Tr.Vol. IV at 195–96. In the alternative, defendant contended that the statements were admissible pursuant to the "catch-all" exception to the rule against hearsay, found in Fed.R.Evid. 803(24). *See* Tr. Vol. VIII at 6. Both of these arguments were unavailing.

Velasco's statements were inadmissible under Rule 804(b)(3) because Velasco was not "unavailable" as that term is expressly defined in the Federal Rules of Evidence. *See* Fed.R.Evid. 804(a)(1)–(5). There is no dispute here that Velasco was in custody at the time of the trial, that he was willing to testify and that the United States Attorney offered to arrange his appearance if the defendant so desired. *See* Tr.Vol. IV at 188.

Conceding that Velasco was thus "available" in body, defendant's attorney argued nonetheless that he was unavailable in spirit:

[I]t seems to me that the court, without reading out the—the requirement of unavailability, could find that [Velasco is] unavailable to me, not in a kind of practical sense, but in a theoretical sense. He's a witness I can't cross-examine. I can't interview before I put him on the stand.

Tr.Vol. VIII at 67. These statements by defense counsel, even if true, overstate the disadvantages she faced and the factors at play that would have permitted her to get Velasco's statements before the jury. While the United States Attorney did not call him as a witness, the defendant knew that Velasco was cooperating with the government and that, if called as a witness for the defense, Velasco would contradict the hearsay statements defendant sought to offer. Yet the hearsay statements defendant wished to use for impeachment were tape recorded. Accordingly, Velasco would have been in no position to deny making the earlier statements, and they would have been admissible to impeach the contrary testimony he presumably would have given regarding his role in the de Dios murder.[4] Thus, while defendant chose not to call Velasco for strategic reasons, he was not "unavailable" under Fed. R.Evid. 804(a).

■ Velasco's statements, as proffered by defendant, were also inadmissible because they failed to meet the corroboration requirement of 804(b)(3). *See* Fed.R.Evid. 804(b)(3) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."). The Court of Appeals has held that this requirement demands both "[c]orroboration of the declarant's trustworthiness, focusing on the declarant's reliability when the statement was made" *and* "corroboration of the declarant's statement, focusing on whether the evidence in the record supports or contradicts the statement." *United States v. Salvador,* 820 F.2d 558, 561 (2d Cir.), *cert. denied,* 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 398 (1987).

Neither the circumstances in which the statements were made, nor the substance of the statements, in light of the evidence in the record, satisfied the corroboration predicate of the rule. As was evident from the testimony of Benitez, *see* Tr.Vol. IV at 104, statements by individuals about their criminal accomplishments are often made untruthfully, for an intended effect on others. Indeed, the very statements in question here were uttered by Velasco in the context of a contemplated sale of illegal contraband. *See* Tr.Vol. VII at 7–8.

The overwhelming evidence in this case that defendant murdered Manuel de Dios also contradicts the several out-of-context statements by Velasco to the effect that *he* murdered de Dios. The defendant, in his post-arrest statement to police officers, admitted that he accompanied Benitez and Salazar to the scene of the murder. While he denied killing de Dios, the explanation he gave for his presence was implausible. Moreover, the descriptions given by the eyewitnesses Gajewski and Aguera, as recorded

---

**4.** While it is true that the prior statements would have been admissible solely to impeach Velasco rather than as affirmative evidence, that distinction is without practical consequence here. *See United States v. De Sisto,* 329 F.2d 929, 933 (2d Cir.) ("The rule limiting the use of prior statements by a witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as 'pious fraud,' 'artificial,' 'basically misguided,' [and]

'mere verbal ritual.' "), *cert. denied,* 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964); *Quartararo v. Mantello,* 715 F.Supp. 449, 461 (E.D.N.Y. 1989) (although state-court trial judge instructed jury to consider defendant's statement only for impeachment purposes and not for "affirmative evidence" against defendant, judge later acknowledged that the statement was "powerful evidence" that altered the case), *aff'd,* 888 F.2d 126 (2d Cir.1989).

on their 911 telephone calls, matched the physical characteristics of the defendant, and not those of Velasco.[5] While corroborating the account of the murder conspiracy given by defendant's accomplices, this evidence strongly contradicted the admission attributed to Velasco.

■ Nor are Velasco's statements admissible pursuant to the "catch-all" exceptions to the hearsay rule. *See* Fed.R.Evid. 803(24) and 804(b)(5). As the legislative history of the rules makes clear, these residual hearsay exceptions were designed to facilitate the admission of hearsay "in situations unanticipated by the other exceptions, but involving equal guarantees of trustworthiness." Weissenberger, *The Admissibility of Grand Jury Transcripts: Avoiding the Constitutional Issue,* 59 Tul.L.Rev. 335, 340 (1984); *see also* Fed.R.Evid. 803(24) Advisory Committee Note. Indeed, it was intended by Congress "that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." S.Rep. No. 93–1277, 93d Cong., 2d Sess. 18–20 (1974); *see also Parsons v. Honeywell,* 929 F.2d 901, 907 (2d Cir.1991).

The statements proffered by defendant were not "unanticipated by the other exceptions" specifically enumerated in Rules 803 and 804. On the contrary, Velasco's statements are declarations against penal interest that are specifically provided for in Rule 804. Nor do they come within the residual exception in Rule 804(b)(5), because that exception, like the specific exceptions enumerated in Rule 804, is conditioned on the unavailability of the declarant.

Perhaps recognizing the impossibility of meeting the requirements of the residual hearsay exception contained in Rule 804(5), the defendant sought to bring the statement within the catch-all exception of Rule 803(24) which may be invoked even if the declarant is

available. The residual exception in 803(24), if applied as defendant suggests, would simply override the restrictions Congress has placed on the admissibility of declarations against penal interest. Because such statements are viewed with suspicion, Congress determined that statements against penal interest should only be admissible when necessitated by the unavailability of the declarant.

> The reasons for the [declaration against penal interest] exception are necessity and trustworthiness. *The unavailability of the declarant's testimony establishes a kind of need to accept his out-of-court statement.* And the against-interest element assures a degree of trustworthiness.

4 Louisell & Miller, § 489 at 1129 (emphasis added).

Moreover, when a declaration against penal interest is offered to exculpate the accused, Congress added the additional requirement that "corroborating circumstances clearly indicate the trustworthiness of the statement." Fed.R.Evid. 804(b)(3); *see* 4 Louisell & Mueller, § 489 at 1149. The invocation of the residual hearsay exception of Rule 803(24) here would essentially read the unavailability and corroboration predicates out of the declaration against penal interest exception.

In any event, the defendant cannot meet the conditions of the residual hearsay exception in Rule 803. Rule 803(24) provides, in pertinent part that, even though the declarant is available as a witness,

> [a] statement not specifically covered by any of the foregoing exceptions [in Rules 803(1)–(23) ] but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; . . . .

---

5. In his telephone call to 911, Gajewski described the assailant as "very, very thin. . . . I think white. . . . about five ten. . . ." Gov't Ex. 33b at 2. In court, Gajewski added that the assailant was "approximately 18 to 25" years old. Tr.Vol. V at 115. Aguera described him as a man in his twenties, having skin of a light color, clean shaven without a moustache or beard, of approximately the same height as de

Dios. Tr.Vol. VI at 84–85. While these descriptions both aptly fit the defendant, Velasco by contrast "is between 5′4″ and 5′6″ tall, about 160 pounds. He's got about shoulder length hair, wavy, a little grey in it. Dark, mostly. Pockmarked face. Male Hispanic. Medium complexion." *See* Tr.Vol. VII at 5 (testimony of Detective Oscar Hernandez).

is not excluded by the hearsay rule. Fed. R.Evid. 803(24).

Velasco's statements were clearly material and the fact that Velasco would have contradicted his hearsay statements, if he had been called to testify, could arguably satisfy the requirement that a statement sought to be admitted pursuant to 803(24) be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Fed.R.Evid. Rule 803(24)(B). Velasco's hearsay statements, however, do not meet the circumstantial guarantees of trustworthiness demanded by the several specific hearsay exceptions contained in Rule 803.

The common denominator of any statement excepted from the hearsay rule in Rule 803(1)–(23) is that the "special circumstances under which it was made offer assurances of accuracy not likely to be enhanced by calling the declarant as a witness, even though he is available." Preliminary Draft of March, 1969, Fed.R.Evid. 803(a) (quoted in 4 Miller & Louisell, § 437 at p. 446). This standard is the *sine qua non* when a statement is sought to be admitted pursuant to the residual exception provided for in Rule 803(24). A declaration against penal interest of the kind the defendant offers here simply fails to meet this standard.